1  Edward R. Glady, Jr./Bar No. 009459
   **SANDERS & PARKS, P.C.**
2  3030 North Third Street, Suite 1300
   Phoenix, AZ  85012-3099
3  Direct Phone: (602) 532-5646
   Direct Fax: (602) 230-5046
4  edward.glady@sanderssparks.com
5
   Julius A. Rousseau III (*Pro Hac Vice* to be filed)
6  **ARENT FOX, LLP**
   1301 Avenue of the Americas, Fl. 42
7  New York, NY 10019
   Direct Phone: (212) 484-3900
8  Direct Fax:
   Jule.Rousseau@arentfox.com
9
10 *Attorneys for Defendant Wilmington Trust, N.A.*

11

12                **UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF ARIZONA**

14
   | Columbus Life Insurance Company, | Case No.:  2:21-cv-00734-DJH |
15 | | |
   | Plaintiff, | **DEFENDANT'S ANSWER AND** |
16 | | **COUNTERCLAIMS** |
   | v. | |
17 | | |
   | Wilmington Trust, N.A. as Securities | |
18 | Intermediary, | |
19 | | |
   | Defendant. | |
20

21       **DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND**
                     **COUNTERCLAIMS**
22

23       Wilmington Trust, N.A., as Securities Intermediary[1] ("Securities Intermediary"), by

24 and through its undersigned attorneys, responds as follows to the allegations in Columbus

25 Life Insurance Company's Complaint dated April 26, 2021 ("Complaint").

26

27 _____

28 [1] Wilmington Trust, N.A, at all relevant times has acted solely as Securities Intermediary for the
   beneficial owner of the life insurance policy at issue in this case ("Policy"), not in its individual
   capacity.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 47-8102(A)(14).

**PARTIES**

1.      Columbus Life is an insurance company incorporated under the laws of Ohio with its principal place of business in Ohio.

**Answer to No. 1:**    Based on the allegations in the Complaint, Securities Intermediary admits upon information and belief the allegations in paragraph 1 of the Complaint.

2.      Upon information and belief, Defendant, Wilmington Trust, N.A., is a national banking association whose articles of association identify the location of its main office as 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801. Wilmington Trust is named as a party to this action solely because, in its capacity as Securities Intermediary, it holds bare legal title as administrator of the Policy (as defined herein).

**Answer to No. 2:**    Securities Intermediary admits the allegations in paragraph 2 of the Complaint and avers that Securities Intermediary is a securities intermediary that holds legal title to the Policy on behalf of a customer.

**JURISDICTION AND VENUE**

3.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Columbus Life, a citizen of Ohio, and Defendant, a citizen of Delaware, and because the amount in controversy exceeds $75,000.

**Answer to No. 3:**    Paragraph 3 of the Complaint does not require a response because it states legal conclusions.  To the extent a response is required, Securities Intermediary admits on information and belief that there is diversity of citizenship between it and the Plaintiff and that the amount in controversy exceeds $75,000.

AFDOCS/24331067.1

4.      This Court has personal jurisdiction over Defendant because, at a minimum, Defendant had sufficient contacts with Arizona through (i) its purchase of the Policy, which insured two Arizona residents and was issued in Arizona with the help of an Arizona agent, and (ii) its efforts to obtain the death benefit of the Policy, which is governed by Arizona law. Defendant also will be properly personally served or will voluntarily waive such service.

**Answer to No. 4:**     Paragraph 4 of the Complaint does not require a response because it states legal conclusions.  To the extent a response is required, Securities Intermediary admits that this court has personal jurisdiction over Securities Intermediary.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Plaintiff's claims occurred in the District of Arizona.

**Answer to No. 5:**     Paragraph 5 of the Complaint does not require a response because it states a legal conclusion.  To the extent a response is required, Securities Intermediary admits upon information and belief that venue is proper in this judicial district.

## FACTS TO ALL CLAIMS

### Background on STOLI and the GIS Scheme Involved Here

6.      For hundreds of years, speculators have sought to use insurance to wager on the lives of strangers. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*") (noting that life wagering has existed "[s]ince the initial creation of life insurance"); *Sun Life v. Wells Fargo*, 238 N.J. 157, 164 (2019)

AFDOCS/24331067.1

(explaining that human life wagering has existed since at least 1419). Under the laws of most jurisdictions, including Arizona, such wagering transactions are void *ab initio* and of no effect. *See, e.g., Gristy v. Hudgens,* 203 P.2d 569 (Ariz. 1922); *San Francisco Sec. Corp. v. Phoenix Motor Corp.,* 220 P.2d 229 (Ariz. 1923).

**Answer to No. 6:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

7. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, *Price Dawe*, 28 A.3d at 1069 (citing Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010)).

**Answer to No. 7:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

8. Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were

- 4 -

interested in high face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as Stranger Originated Life Insurance ("STOLI") policies.

**Answer to No. 8:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

9.    Upon information and belief, one such STOLI program was operated in Arizona by an insurance producer by the name of Reid Johnson, and others, and was known as the "Guaranteed Income Strategy" or "GIS" scheme.

**Answer to No. 9:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

10.    Upon information and belief, pursuant to the GIS scheme, Johnson and others with whom he was working including Jeffrey Clark, identified, typically in Arizona, senior citizens meeting their investment criteria and convinced those seniors to become involved in the STOLI transactions they were orchestrating. These STOLI transactions involved the creation of a "Family LLLP" in the name of the insureds with an entity known as Altair LLC as the general partner of the Family LLLP. Altair, as the general partner of the Family

AFDOCS/24331067.1

LLLP, was in control of the Family LLLP, and Johnson, as the general partner of Altair, was in control of Altair.

**Answer to No. 10:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

11. As explained by the United States Securities and Exchange Commission, Johnson's GIS scheme centered around an "insurance arbitrage strategy involving the purchase of a single premium immediate annuity [SPIA] and life insurance policy" for the benefit of investors. Specifically, upon information and belief, Johnson and the others with whom he was working would acquire not just life insurance on the lives of these senior citizens but also large annuity polices that would produce income each month that would serve as a financial hedge bet in favor of the investors in case the senior citizen insureds lived too long.

**Answer to No. 11:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

12. Upon information and belief, these STOLI transactions were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety.

**Answer to No. 12:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the

AFDOCS/24331067.1

Complaint and denies that the allegations stated bear any relevance to the issues presented here.

13.     Upon information and belief, the insureds who were the subject of these transactions neither wanted nor need life insurance, and did not pay anything for these policies or this insurance.

**Answer to No. 13:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

14.     STOLI schemes violate Arizona insurable interest laws and the public policy against wagering on human life, and these schemes victimize the seniors who are induced to permit these polices to be procured on their lives.

**Answer to No. 14:**  Paragraph 14 of the Complaint does not require a response because it states legal conclusions.  To the extent a response is required, Securities Intermediary denies the allegations in paragraph 14.

15.     In short, STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of the insureds—into cash machines whereby strangers to the insureds are more interested in seeing the insureds dead than alive.

AFDOCS/24331067.1

**Answer to No. 15:** Paragraph 15 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations in paragraph 15.

**The Peterson's Policy**

16.      In the mid-2000s, Howard and Eunice Peterson were husband and wife, in their early-eighties living in Sun City West, Arizona.

**Answer to No. 16:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint.

17.      Upon information and belief, in or around 2003 and 2004, Johnson and others appear to have used Mr. and Mrs. Peterson to procure a multi-million dollar life insurance policy—not for the Petersons or their family or for a legitimate insurance purpose—but rather for Johnson and others.

**Answer to No. 17:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.      Upon information and belief, Johnson and others specifically procured a $2.5 million dollar, second to die, life insurance policy, on the lives of the Petersons, from Columbus Life (the "Policy").[2] (A copy of the Columbus Life insurance policy at issue is attached hereto as Exhibit "A.")

---

[2] A second-to die policy provides for a death benefit only after the death of the last of the two insureds to die

**Answer to No. 18:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint.

19. Upon information and belief, Johnson and the others did not have an insurable interest in the Petersons' lives and would not have been able to acquire the Policy had they not used the Petersons to generate the Policy in the first instance.

**Answer to No. 19:** Paragraph 19 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 19 of the Complaint.

20. Upon information and belief, specifically, on or around November 25, 2003, Johnson and the others submitted an application for life insurance to Columbus Life, purportedly executed by the Petersons.

**Answer to No. 20:** Securities Intermediary admits that Howard and Eunice Peterson executed an application for an insurance policy and submitted it to Columbus Life Insurance Company. Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 20 of the Complaint.

21. The application sought a $2.5 million policy naming the H & E Peterson Family Partnership LLLP as the initial owner and beneficiary

**Answer to No. 21:** Securities Intermediary admits the allegations contained in paragraph 21 of the Complaint.

AFDOCS/24331067.1

22.     In reliance upon the representations contained in the application documents and other documents and information submitted to Columbus Life, Columbus Life issued an Arizona life insurance policy, with number CM5008425U, on the lives of the Petersons. (Ex. A.)

**Answer to No. 22:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     On or about May 6, 2004, the first premium was paid on the Policy in the amount of $81,525.

**Answer to No. 23:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint.

24.     Upon information and belief, the source of this and other premium payments on the Policy was not the insureds but instead from others who lacked an insurable interest in the insureds.

**Answer to No. 24:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint.

25.     Approximately two years after the Policy was delivered and the first premium payment was made, the ownership and beneficiary designations on the Policy were changed to Church Street Nominees, Ltd.

AFDOCS/24331067.1

**Answer to No. 25:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 of the Complaint.

26.     On or about September 3, 2013, the ownership and beneficiary designations in the Policy were changed again, this time to Wilmington Trust.

**Answer to No. 26:** Securities Intermediary admits the allegations contained in paragraph 26 of the Complaint.

27.     On or about January 17, 2018, Howard Peterson died.

**Answer to No. 27:** Securities Intermediary admits the allegations contained in paragraph 27 of the Complaint.

28.     On or about May 1, 2020, Eunice Peterson died.

**Answer to No. 28:** Securities Intermediary admits the allegations contained in paragraph 28 of the Complaint.

29.     Premiums continued to be made on the Policy even after both Howard and Eunice Peterson were dead, including a final premium payment in December 2020 by an account at Wells Fargo Bank, N.A., apparently on behalf of VICOF II, an investment fund managed by Vida Capital Management.

**Answer to No. 29:** Securities Intermediary admits the allegations contained in paragraph 29 of the Complaint.

30.     A claim has been made on the Policy by Wilmington Trust.

**Answer to No. 30:** Securities Intermediary admits the allegations contained in paragraph 30 of the Complaint.

31.    Columbus Life has investigated this claim and now believes that the Policy was procured by Johnson and others through the GIS STOLI scheme and that, under Arizona law, the Policy lacked an insurable interest prior to and at its inception and was merely a wager on the Petersons' lives.

**Answer to No. 31:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Complaint.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT –**
**ILLEGAL HUMAN LIFE WAGERING CONTRACT**

32.    Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

**Answer to No. 32:**  Securities Intermediary hereby incorporates by reference its answers to each and every allegation contained in the preceding paragraphs as if set forth herein.

33.    The Policy was applied for and executed in Arizona by Arizona citizens as insureds and by an Arizona LLLP as owner and beneficiary. The Policy was then actually delivered to the LLLP owner in Arizona. The Policy is governed by Arizona law.

**Answer to No. 33:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Complaint.

34.    Arizona's Insurance Code provides that "no person shall procure or cause to be procured any insurance contract on the life or body of another individual unless the

benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured." Ariz. Rev. Stat. § 20-1104(A).

**Answer to No. 34:** Securities Intermediary admits that the quoted language appears in Ariz. Rev. Stat. § 20-1104(A) but denies that the quoted language bears any relevance to the issues presented here.

35.     Under Arizona law, a "valid contract of insurance cannot legally be taken on the life of another by one who has no insurable interest in said life, because such a contract contravenes public policy." *Gristy v. Hudgens*, 203 P. 569, 572 (Ariz. 1922). Indeed, "[t]he general rule of law is . . . that whatever tends . . . to be violation of a statute, and whatever is against good morals, when made the subject of a contract, is against public policy and void. It is said that they are not contracts, but unlawful agreements which are void in their inception." *San Francisco Sec. Corp. v. Phoenix Motor Co.*, 220 P. 229, 232 (Ariz. 1923) (emphasis added). Moreover, "this 'insurable interest' requirement [is] likewise [] violated when the insured is working together with an assignee to acquire an insurance policy where the circumstances indicate that the assignee is the real purchaser of the policy." *Sun Life v. Moran*, No. CV-08-0629, 2009 WL 2450443 (D. Ariz. Aug. 11, 2009).

**Answer to No. 35:** Paragraph 35 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 35 of the Complaint.

AFDOCS/24331067.1

36. Here, upon information and belief, stranger investors were wagering on Mr. and Mrs. Peterson's life and hoping to trigger a secondary market cash-in on the Policy's $2.5 million death benefit.

**Answer to No. 36:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Complaint.

37. Accordingly, Columbus Life seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated Arizona law, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

**Answer to No. 37:** Securities Intermediary admits that the Plaintiff purports to seek the requested relief and otherwise denies the allegations of paragraph 37 of the Complaint.

**SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**LACK OF INSURABLE INTEREST**

38. Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

**Answer to No. 38:** Securities Intermediary hereby incorporates by reference its answers to each and every allegation contained in the preceding paragraphs as if set forth herein.

39. Under Arizona law, a policy not supported by an insurable interest at its inception is void *ab initio*. *See San Francisco Sec. Corp.*, 220 P. at 232 ("It is said that they are not contracts, but unlawful agreements which are void in their inception."). Where a

AFDOCS/24331067.1

contract is void *ab initio* as against public policy, the contract is unenforceable and the parties to such contracts are left where they are found. *Landi v. Arkules*, 835 P.2d 458, 468 (Ariz. Ct. App. 1992).

**Answer to No. 39:** Paragraph 39 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 39 of the Complaint.

40. As set forth above, upon information and belief, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Under such circumstances, the Policy is void *ab initio*.

**Answer to No. 40:** Securities Intermediary denies that the Policy is void *ab initio*. Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 40 of the Complaint.

41. Therefore, Columbus Life seeks, and is entitled to, a declaratory judgment that the Policy lacked an insurable interest because it was procured by and for the benefit of strangers without any insurable interest under Arizona law.

**Answer to No. 41:** Securities Intermediary admits that the Carrier purports to seek the relief requested, but denies the remainder of the allegations contained in paragraph 41 of the Complaint.

/ / /

/ / /

/ / /

WHEREFORE, Columbus Life respectfully requests the entry of Judgment by this Court as follows:

    a. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Mr. and Mrs. Peterson;

    b. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

    c. Declaring that because the Policy is void *ab initio* it never existed;

    d. Declaring the [sic] because the Policy is void *ab initio* the Court will leave the parties to this illegal contract as it finds them, thus permitting Columbus Life to retain the premiums paid on the Policy, or, in the alternative, declaring that Columbus Life may retain some or all of the premiums paid on the Policy to effectuate an offset with respect to Columbus Life's costs and losses associated with the Policy;

    e. Awarding Columbus Life attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

    f. Awarding Columbus Life any further relief this court deems appropriate.

**Answer to Final Paragraph**: Securities Intermediary admits that the Plaintiff purports to seek the requested relief and otherwise denies the allegations of the final paragraph of the Complaint.

## DEFENSES

Securities Intermediary asserts the following defenses to the claims set forth in the Complaint. Securities Intermediary reserves its right to assert defenses other than those set

AFDOCS/24331067.1

forth below of which it becomes aware through discovery or other investigations as may be appropriate at a later time.

### FIRST DEFENSE
*(Failure to State a Claim)*

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE
*(Statute of Limitations)*

Plaintiff's claims for relief are barred, in whole or in part, by the applicable statute(s) of limitation and/or by the contestability period set forth in the Policy.

### THIRD DEFENSE
*(Waiver, Ratification, Laches, Unclean Hands, In Pari Delicto)*

Plaintiff's claims for relief are barred, in whole or in part, by the doctrines of waiver, laches, unclean hands and *in pari delicto*. Plaintiff, on information and belief, has been aware or should have been aware of the facts that it contends justify rescission of the Policy (and/or a declaration that the Policy is void) long before it received a claim for the Policy's death benefit. Yet, with such actual or constructive knowledge, Plaintiff issued the Policy, accepted premiums for the Policy, and otherwise treated the Policy as if it was valid and enforceable at all times prior to receiving the claim; and took no action to rescind and/or void the Policy until after receiving that claim, all to the material damage and detriment of Securities Intermediary and its customer, a securities entitlement holder, on whose behalf Securities Intermediary owns the Policy.

/ / /

AFDOCS/24331067.1

## FOURTH DEFENSE
*(Unjust Enrichment)*

Plaintiff's claims are barred in whole or part by the doctrine of unjust enrichment.

## FIFTH DEFENSE
*(Uniform Commercial Code)*

Plaintiff's claims for relief against Securities Intermediary are precluded by the Uniform Commercial Code.

## SIXTH DEFENSE
*(Incontestability)*

Plaintiff's claims are barred by Ariz. Rev. Stat. Ann. § 20-1204. *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 89 Ariz. 253, 256, 360 P.2d 1030, 1032 (1961) ("every exception to incontestability not expressed in the statute itself is specifically barred as a defense to the policy after the expiration of the incontestability period.").

## COUNTERCLAIMS

Defendant-Counterclaim Plaintiff Wilmington Trust, N.A., as Securities Intermediary, as and for its counterclaims, pursuant to Rule 13 of the Federal Rules of Civil Procedure, asserts against Plaintiff-Counterclaim Defendant Columbus Life Insurance Company and alleges upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

1.      In November of 2003, Howard and Eunice Peterson (the "Insureds"), submitted an application for life insurance to Columbus Life Insurance Company ("Carrier"). The Application made clear that the owner and beneficiary of the proposed policy would be H&E Peterson Family Partnership, LLLP (the "Partnership"). The Carrier agreed to insure the Petersons, and issued a "second to die" policy number CM5008425U

carrying a $2,500,000 million death benefit (the "Policy"), with the Partnership as the initial owner and beneficiary.

2. Under the Policy, the Carrier agreed to pay the Policy death benefit after both insureds had died.

3. The Petersons have died; Securities Intermediary timely submitted a claim for the death benefit under the Policy to the Carrier; and the Carrier has wrongfully failed to pay the death benefit due and owing. Instead, the Carrier commenced a time-barred lawsuit against Securities Intermediary seeking to rescind the Policy on the ground that the Policy is invalid and was procured as part of an illegal stranger originated life insurance ("STOLI") scheme, and, therefore, in violation of applicable insurable interest laws. But the Carrier's suit is specifically foreclosed by the Arizona Supreme Court's holding in *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 89 Ariz. 253, 256, 360 P.2d 1030, 1032 (1961) ("every exception to incontestability not expressed in the statute itself is specifically barred as a defense to the policy after the expiration of the incontestability period.").

4. Moreover, the Carrier has been aware of all of the facts that it now belatedly relies upon to seek rescission of the Policy, and demanded, received, and accepted premiums, and represented to Securities Intermediary in writing that the Policy was valid and enforceable, for years after having such knowledge.

5. What's more, Securities Intermediary had nothing to do with the procurement of the Policy or any of the alleged STOLI activity for which the Carrier now untimely seeks rescission. Rather, Securities Intermediary became the owner and beneficiary of record of the Policy, without any objection from the Carrier, years after the

Policy had been issued. Securities Intermediary's client, a securities entitlement holder, acquired the Policy legitimately in the tertiary life insurance market as a bona fide purchaser for value, and retained Securities Intermediary to hold title to the Policy with the life insurance company.

6.      This lawsuit seeks to put the Carrier's deceptive and unfair insurance trade practices to an end. It seeks compensatory and punitive damages, and applicable interest, for the Carrier's breach of contract and failure to pay the Policy death benefit and as damages for the Carrier's bad faith conduct.

## THE PARTIES

7.      Securities Intermediary is the current owner and beneficiary of record of the Policy, as securities intermediary on behalf of its customer, a securities entitlement holder. Securities Intermediary is a national banking association organized and existing under federal law with its main office located in Wilmington, Delaware, as identified in its Articles of Association. Securities Intermediary maintains a principal place of business in Delaware. Securities Intermediary is not a citizen of Ohio for purposes of diversity jurisdiction.

8.      At all times herein Securities Intermediary acts solely as securities intermediary for a third-party investor, and does not act in its individual capacity. *See, e.g.,* Ariz. Rev. Stat. Ann. § 47-8102(A)(14) (defining role of securities intermediary).

9.      Based on the allegations in the Complaint, the Carrier is an Ohio corporation with its principal places of business in Ohio.

**JURISDICTION & VENUE**

10.     Based on the allegations in the Complaint, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based upon the diversity of citizenship of the parties, and the amount in controversy exceeding $75,000, exclusive of interest and costs.

11.     Based on the allegations in the Complaint, venue lies within this District under the provisions of 28 U.S.C. § 1391(a)(1), (a)(2), and 1391(b) because Carrier conducts business in the District of Arizona and a substantial part of the events and/or omissions giving rise to the bad faith claims against Carrier occurred within this District.

**FACTS**

12.     On or about November 25, 2003, Howard and Eunice Peterson completed an application for the Policy and submitted it to the Carrier.

13.      The Carrier issued the Policy, back dating it with a policy date of October 26, 2003.

14.     The Policy states "[t]his Policy is a contract between You [the Policy owner] and Us [Carrier] to insure the joint lives of the Insureds." D.E. 1-1 at 19 of 40.

15.     The Policy states that the "We [the Carrier] will pay the Death Benefit as described in the Payment of Proceeds section when We receive proof that both insureds died while this policy was in force, and any other proof that We may require in order to investigate the claim." D.E. 1-1 at 20 of 40.

16.     The Policy states that "We [Carrier] will not contest this policy to the extent of the Specified Amount after it has been in effect during both Insured's lifetimes for two years from the Policy Date." D.E. 1-1 at 34 of 40.

AFDOCS/24331067.1

17.     The "Specified Amount" is defined in the Policy as the amount of insurance coverage the policy owner selected, as shown in the Policy Schedule. D.E. 1-1 at 17 of 40.

18.     The Specified Amount of the Policy is $2,500,000. D.E. 1-1 at 4 of 40.

19.     Based on the allegations in the Complaint, on or about September 3, 2013, the Carrier received and processed a request to change the owner and beneficiary of the Policy to Securities Intermediary.

20.     Since 2013, Securities Intermediary has held the Policy in a securities account for the benefit of a customer, which, at all times, has been a securities entitlement holder. Securities Intermediary's current customer acquired the Policy legitimately in the tertiary life insurance market as a bona fide purchaser for value, and retained Securities Intermediary to hold title to the Policy with the life insurance company.

21.     Neither Securities Intermediary, nor its customer, had any involvement in the original procurement of the Policy.

22.     On or about January 17, 2018, Howard Peterson died.

23.     On or about May 1, 2020, Eunice Peterson died.

24.     On or about December 29, 2020, Securities Intermediary submitted a death claim to the Carrier under the Policy on behalf of the policy's beneficial owner.

25.     The Carrier has failed to pay the death claim.

26.     According to the Carrier, it has "investigated" the death claim and "now believes" that the Policy was procured by strangers to the Petersons as part of a "STOLI scheme" and, therefore, the Policy lacked an insurable interest prior to and at its inception and was merely an unlawful wager on the Petersons' lives. D.E. 1 at ¶ 31. Significantly, all

of the information to which the Carrier refers in support of this supposed determination – most notably, the identity of the Policy owner and beneficiaries and the involvement of a particular broker, Reid Johnson – is information that the Carrier has known long before Ms. Peterson's death. *Id.* at ¶¶ 9-11, 31. It is thus self-evident that the Carrier could have chosen to "investigate" and make these claims long ago, and it is quite possible that it did in fact learn all the facts that it alleges in the complaint years ago.

27. Between the Policy's issuance in 2003 and the death of Eunice Peterson on May 1, 2020, the Carrier collected at least $1,375,601.95 in premium payments on the Policy. Throughout that time, the Carrier regularly represented, in writing, to Securities Intermediary that the Policy was valid and in force; and repeatedly acknowledged Securities Intermediary's status as owner and beneficiary.

28. Following the Insureds' deaths, the Carrier was mistakenly paid at least $235,554.13 in premium in connection with the Policy.

29. The Carrier has agreed to return all premiums paid in connection with the Policy that were paid after both Insureds had died.

30. To date, the Carrier has failed to return any premium, even the portion paid after the Insureds had died.

31. The Carrier's past conduct of sending Securities Intermediary annual statements, illustrations, and premium and lapse notices in and after 2013 and until a death claim was submitted to it under the Policy in 2020, each of which represented to Securities Intermediary, and its customer, that the Carrier believed the Policy to be valid and enforceable, are past acts that were committed with the intent to induce Securities

AFDOCS/24331067.1

Intermediary and the securities entitlement holders to believe that the Carrier considered the Policy to be valid and enforceable, and to induce Securities Intermediary and its client to continue to pay premiums for the Policy.

32.     When the Carrier sent each written communication to Securities Intermediary representing that it (the Carrier) considered the Policy to be valid and enforceable, it did so under false pretenses. The Carrier sent each of these written communications intending to induce Securities Intermediary and its client to pay more premium for the Policy to illegitimately enrich the Carrier, even as the Carrier never intended to honor the Policy. For nearly a decade, based on the Carrier's insidious conduct, the Carrier has put Securities Intermediary in a "Heads I [the Carrier] Win, Tails You [Securities Intermediary] Lose" situation.

33.     As noted in a Memorandum Opinion issued on May 17, 2019 in *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.) (D.E. 251), wherein the court had determined that the subject life policy was invalid but nevertheless allowed the policy owner's claims for unfair trade practices act violations and a theory of promissory estoppel to proceed to trial under circumstances identical to those at issue here:

> [T]he Court concludes that a reasonable factfinder could find that Sun Life engaged in an unfair and/or deceptive act in connection with its handling of this Policy. These conclusions arise from the Court's determination that, based on all the circumstances of the case, a reasonable jury could find that Sun Life unfairly, unethically, and unscrupulously misrepresented the state of the Policy to induce U.S. Bank . . . to continue making hundreds of thousands of dollars in premium payments, when, in fact (as a reasonable jury could find) Sun

- 24 -

Life had already determined that it would not honor the Policy. For the same reasons, a reasonable jury could find that Sun Life acted deceptively in making the statements it made, and thereby caused U.S. Bank to act differently than it otherwise would have. Even accepting, *arguendo*, that Sun Life had no affirmative obligation to disclose to U.S. Bank its internal beliefs and intent, Sun Life's internal beliefs and intent may still be relevant to the factual question of whether Sun Life made willful representations that constitute an unfair and/or deceptive act.

\* \* \*

In the Court's view, it would not be unreasonable for the jury . . . to find that Sun Life had decided the Policy was STOLI and thereby void, and had further decided it would not honor the Policy, yet continued to make representations that the Policy was in "good standing." Essentially, the parties dispute whether it would be reasonable for a jury confronted with this evidence, and taking it all in the light most favorable to U.S. Bank, to find that Sun Life misrepresented the state of the Policy in an effort to induce U.S. Bank to continue paying premiums. While reasonable minds could well differ as to the reasonableness of such inference, this Court concludes that it would be reasonable for a jury to reach such a finding.

*Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.) (D.E. 251) (Mem. Opin.), at 4-7 (footnotes omitted).

34.     Following a six day jury trial in *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, the jury found in favor of U.S. Bank on its promissory estoppel claim. The trial court subsequently denied Sun Life's post-trial motion challenging the verdict, concluding as follows: "The jury had ample evidence from which it could have reasonably found that Sun Life's promise to pay, if premiums continued to be paid, to have been reasonably certain and definite." *Sun Life Assurance Company of Canada v. U.S. Bank National Association*, No. 1:17-cv-00075-LPS (D. Del.) (D.E. 296)

(Dec. 30, 2019 Mem. Order), at 4. As a result, the Delaware federal district court ordered that "U.S. Bank will be awarded restitution damages totaling $1,923,068 (the total amount of premiums paid to Sun Life on the Sol Policy), plus prejudgment interest . . . ." *Id.* at 5.

35.    The same exact conduct that caused the federal Delaware court in *Sun Life Assurance Company of Canada v. U.S. Bank National Association* to allow U.S. Bank's unfair trade practices act and promissory estoppel claims to go to the jury exist here.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

36.    Securities Intermediary repeats and realleges each and every allegation above as it fully set forth herein.

37.    The Policy, by its terms, provides that the Carrier shall make payment of the Policy's death benefit once it received "proof that both insureds died while this policy was in force, and any other proof that We [the Carrier] may require in order to investigate the claim;" and that the Carrier shall be barred from challenging the validity of the Policy after it has been in force during both of the insureds' lifetimes for two years from its Policy Date.

38.    Following the Petersons' deaths, Securities Intermediary sent the Carrier proof of the Petersons' deaths, and otherwise provided the Carrier with all other information that it needed in order to process the death claim on behalf of the Policy's beneficial owner.

39.    The Carrier has failed to pay the Policy's death benefit to Securities Intermediary.

40.    The Carrier took no action to rescind and/or contest the validity of the Policy until after receiving the death claim.

AFDOCS/24331067.1

41. The Carrier therefore breached the terms of the Policy by failing to pay the Policy's death benefit and applicable interest to Securities Intermediary.

42. The Carrier further breached the terms of the Policy by commencing its Arizona lawsuit challenging the validity of the Policy, even though the Policy had been in force during the Insureds' lifetimes for more than two years from the Policy's issue date.

43. Securities Intermediary has performed all its duties and obligations under the Policy.

44. As a result of the aforementioned breaches by the Carrier, Securities Intermediary (and its customer on behalf of which it owns the Policy) has been damaged in a sum to be determined by the trier of fact after trial, which damages include, but are not limited to, $2,500,000, representing the principal amount of the Policy's death benefit, plus applicable interest, as well as the fees and costs that Plaintiff has incurred and will continue to incur as a result of the Carrier's wrongful conduct in belatedly challenging the validity of the Policy.

## SECOND CAUSE OF ACTION
### (Bad Faith)

45. Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

46. The Carrier issued the Policy on October 26, 2003.

47. Securities Intermediary is the record owner and beneficiary of the Policy with the Carrier.

48.     Following the Insureds' deaths, Securities Intermediary timely submitted a death claim to the Carrier on behalf of the Policy's beneficial owner.

49.     Securities Intermediary has performed all of its obligations under the Policy.

50.     The Carrier has intentionally failed to pay the death claim.

51.     The Carrier (i) lacks any reasonable basis on which to deny Securities Intermediary's claim for the Policy death benefit, and (ii) knows—or has recklessly disregarded the existence—of such absence of a reasonable basis on which to deny Securities Intermediary's claim.

52.     The Carrier lacks any reasonable basis for denying Securities Intermediary's claim for the Policy death benefit because the Carrier has knowingly and intentionally: (a) refused to pay Securities Intermediary's death claim without conducting a reasonable investigation and/or based on incorrect assertions of fact and in reliance on facts of which it has been aware, but has chosen to ignore, in collecting and accepting premium payments on the Policy; (b) represented that the Policy was valid and enforceable, and demanded that additional premium payments be made by Securities Intermediary to the Carrier to keep the Policy in force, all the while intending to seek to rescind the Policy after receiving a death claim and intending also to make a claim in court to keep all premiums paid for the Policy; (c) forced Securities Intermediary to litigate this action in order to compel the Carrier's performance under the Policy; (d) failed to adopt and implement reasonable standards applicable to the Policy for prompt investigation and payment of claims; (e) lied to Securities Intermediary regarding its claim-handling; (f) failed to promptly pay the death

AFDOCS/24331067.1

claim even though the Carrier's liability is clear; (g) failed to return unearned premium paid after the Insureds had died.

53.    Securities Intermediary (and its customer on behalf of which it owns the Policy) has directly suffered a loss of money or property caused by the Carrier's unfair, unreasonable and deceptive acts or practices. The Carrier has failed and refused to pay to Securities Intermediary the $2,500,000 death benefit promised in the Policy, even though the Carrier has been paid at least $1,611,156.08 in premium.

54.    The Carrier has also failed to return Policy premium paid by Securities Intermediary, including premium that it admits were paid to the Carrier after the Insureds' had died. D.E. 1 at ¶ 29.

55.    The Carrier's unfair or deceptive acts or practices described above were intentional or knowing violations. The Carrier knew for years and knows now that it has no legitimate basis for refusing to pay the Securities Intermediary's death claim, and willfully misrepresented that it would do so.

### THIRD CAUSE OF ACTION
**(Promissory Estoppel)**

56.    Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

57.    The Carrier issued the Policy on October 26, 2003.

58.    The Carrier, with full knowledge that Securities Intermediary was the Policy's owner and beneficiary of record, represented that the Policy was valid and in force, and induced Securities Intermediary (and its customer on behalf of which it owns the Policy) to pay the Carrier substantial premiums on the Policy, even though the Carrier had

- 29 -

already determined that it would challenge the Policy in court rather than honor it and to seek to retain all premiums paid for the Policy.

59.     The Carrier accepted premium payments on the Policy and otherwise treated it as if it was valid and enforceable at all times prior to receiving the premiums from Securities Intermediary.

60.     The Carrier has acted in a manner that has caused Securities Intermediary (and its customer on behalf of which it owns the Policy) to reasonably believe that the Policy was a valid and enforceable life insurance policy for which the death benefit would be duly paid upon the death of the Policy's insured because the Carrier: issued the Policy; accepted premium for the Policy; and otherwise treated the Policy as if it was valid and enforceable at all times prior to receiving the death claim.

61.     The Carrier took no action to rescind and/or contest the validity of the Policy until after receiving the death claim.

62.     Securities Intermediary's (and its customer on behalf of which it owns the Policy) belief that the Policy was valid and enforceable was reasonable and a foreseeable result of the Carrier's conduct.

63.     The Carrier has been aware of the facts that it contends justify a rescission of the Policy (and/or a declaration that the Policy is void) either before it issued the Policy, or after it issued the Policy, but well before it received the death claim and well before it commenced its lawsuit to rescind and/or void the Policy and keep all premiums paid.

64.     The Carrier filed its lawsuit alleging that the Policy is void.

65. As a result of the Carrier's conduct, Securities Intermediary (and its customer on behalf of which it owns the Policy) has been damaged in a sum to be determined by the trier of fact after trial, which damages include, but are not limited to, $2,500,000, representing the principal amount of the Policy's death benefit, plus applicable interest, as well as the fees and costs Plaintiff has incurred and will continue to incur as a result of the Carrier's wrongful conduct in challenging the validity of the Policy.

**FOURTH CAUSE OF ACTION**
(**Unjust Enrichment**)

66. Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

67. The Carrier alleges that the Policy is void.

68. All premiums due on the Policy have been timely and fully paid, and the Carrier has received a total amount of at least $1,611,156.08 in premium payments on the Policy.

69. To the extent the Policy is somehow void, which claim is invalid for the reasons set forth above, no coverage would have ever attached and, therefore, the premiums paid to the Carrier in connection with the Policy over the past 18 years would not have been earned.

70. Under such circumstances, it would be inequitable for the Carrier to retain any of the premiums paid to it in connection with the Policy.

AFDOCS/24331067.1

## JURY TRIAL DEMAND

Securities Intermediary hereby demands a trial by jury for all issues that may be triable by jury in this action.

## DEMAND FOR RELIEF

**WHEREFORE**, Securities Intermediary demands judgment in its favor as follows:

A.   Declaring that the Carrier must pay Plaintiff the benefits owed under the Policy;

B.   Awarding Plaintiff compensatory damages in an amount to be determined at trial but not less than $2,500,000 plus interest and punitive damages;

C.   Alternatively, in the event that the Policy is declared invalid and rescinded, a declaration that the Carrier must pay to Securities Intermediary all amounts paid as premiums under the Policy, plus pre- and post-judgment interest;

D.   Awarding Securities Intermediary its attorneys' fees, costs, and disbursements;

E.   Pre- and post-judgment interest as authorized by law; and

F.   Such other and further relief as the Court shall deem just and proper.

/ / /

/ / /

/ / /

AFDOCS/24331067.1

RESPECTFULLY SUBMITTED this 14th day of July, 2021

**SANDERS & PARKS, P.C.**

By  /s/ Edward R. Glady, Jr.
    Edward R. Glady, Jr.
    3030 North Third Street, Suite 1300
    Phoenix, AZ  85012-3099

and

**ARENT FOX, LLP**

Julius A. Rousseau III (Pro Hac Vice to be filed)
1301 Avenue of the Americas, Fl. 42
New York, NY 10019
Attorneys for Defendant Wilmington Trust, N.A.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nancy R. Giles
**GILES LAW, PLLC**
4808 N. 22nd St., Suite 200
Phoenix, AZ 85016
ngiles@gileslegal.com
*Attorneys for Plaintiffs*


 /s/  Katie Martin

AFDOCS/24331067.1