Edward R. Glady, Jr./Bar No. 009459
Vincent R. Miner/Bar No. 033879
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ 85012-3099
Direct Phone: (602) 532-5646
edward.glady@sandersparks.com
vincent.miner@sandersparks.com

Julius A. Rousseau, III (*Admitted Pro Hac Vice*)
Andrew Dykens (*Admitted Pro Hac Vice*)
**ARENTFOX SCHIFF, LLP**
1301 Avenue of the Americas, Fl. 42
New York, NY 10019
Direct Phone: (212) 484-3900
Jule.Rousseau@arentfox.com

*Attorneys for Defendant and Counterclaim-Plaintiff*
*Wilmington Trust, N.A., as Securities Intermediary*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Columbus Life Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Wilmington Trust, N.A. as Securities Intermediary,<br><br>Defendant. | Case No.: 2:21-cv-00734-DJH<br><br>**WILMINGTON TRUST, AS SECURITIES INTERMEDIARY'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |

| | |
|---|---|
| Wilmington Trust, N.A. as Securities Intermediary, | |
| | Defendant-Counterclaim Plaintiff, |
| v. | |
| Columbus Life Insurance Company, | |
| | Plaintiff-Counterclaim Defendant. |

Wilmington Trust, N.A., as Securities Intermediary[1] ("Securities Intermediary"), by and through its undersigned attorneys, responds as follows to the allegations in Columbus Life Insurance Company's Complaint dated April 26, 2021 ("Complaint").

## PARTIES

1.      Columbus Life is an insurance company incorporated under the laws of Ohio with its principal place of business in Ohio.

**Answer to No. 1:**      Based on the allegations in the Complaint, Securities Intermediary admits upon information and belief the allegations in paragraph 1 of the Complaint.

2.      Upon information and belief, Defendant, Wilmington Trust, N.A., is a national banking association whose articles of association identify the location of its main office as 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801. Wilmington Trust is named as a party to this action solely because, in its capacity as Securities Intermediary, it holds bare legal title as administrator of the Policy (as defined herein).

---

[1] Wilmington Trust, N.A, at all relevant times has acted solely as Securities Intermediary for the beneficial owner of the life insurance policy at issue in this case ("Policy"), not in its individual capacity. *See, e.g.*, Ariz. Rev. Stat. Ann. § 47-8102(A)(14).

**Answer to No. 2:** Securities Intermediary admits the allegations in paragraph 2 of the Complaint and avers that Securities Intermediary is a securities intermediary that holds legal title to the Policy on behalf of a customer.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Columbus Life, a citizen of Ohio, and Defendant, a citizen of Delaware, and because the amount in controversy exceeds $75,000.

**Answer to No. 3:** Paragraph 3 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary admits on information and belief that there is diversity of citizenship between it and the Plaintiff and that the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over Defendant because, at a minimum, Defendant had sufficient contacts with Arizona through (i) its purchase of the Policy, which insured two Arizona residents and was issued in Arizona with the help of an Arizona agent, and (ii) its efforts to obtain the death benefit of the Policy, which is governed by Arizona law. Defendant also will be properly personally served or will voluntarily waive such service.

**Answer to No. 4:** Paragraph 4 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary admits that this court has personal jurisdiction over Securities Intermediary.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Plaintiff's claims occurred in the District of Arizona.

**Answer to No. 5:**      Paragraph 5 of the Complaint does not require a response because it states a legal conclusion.  To the extent a response is required, Securities Intermediary admits upon information and belief that venue is proper in this judicial district.

## FACTS TO ALL CLAIMS
### Background on STOLI and the GIS Scheme Involved Here

6.      For hundreds of years, speculators have sought to use insurance to wager on the lives of strangers. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*") (noting that life wagering has existed "[s]ince the initial creation of life insurance"); *Sun Life v. Wells Fargo*, 238 N.J. 157, 164 (2019) (explaining that human life wagering has existed since at least 1419). Under the laws of most jurisdictions, including Arizona, such wagering transactions are void *ab initio* and of no effect. *See, e.g., Gristy v. Hudgens,* 203 P.2d 569 (Ariz. 1922); *San Francisco Sec. Corp. v. Phoenix Motor Corp.,* 220 P.2d 229 (Ariz. 1923).

**Answer to No. 6:**      Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 of the

Complaint and denies that the allegations stated bear any relevance to the issues presented here.

7.      Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large

blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, *Price Dawe*, 28 A.3d at 1069 (citing Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010)).

**Answer to No. 7:**      Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

8.      Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as Stranger Originated Life Insurance ("STOLI") policies.

**Answer to No. 8:**    Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

9.    Upon information and belief, one such STOLI program was operated in Arizona by an insurance producer by the name of Reid Johnson, and others, and was known as the "Guaranteed Income Strategy" or "GIS" scheme.

**Answer to No. 9:**    Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

10.    Upon information and belief, pursuant to the GIS scheme, Johnson and others with whom he was working including Jeffrey Clark, identified, typically in Arizona, senior citizens meeting their investment criteria and convinced those seniors to become involved in the STOLI transactions they were orchestrating. These STOLI transactions involved the creation of a "Family LLLP" in the name of the insureds with an entity known as Altair LLC as the general partner of the Family LLLP. Altair, as the general partner of the Family LLLP, was in control of the Family LLLP, and Johnson, as the general partner of Altair, was in control of Altair.

**Answer to No. 10:**    Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the

Complaint and denies that the allegations stated bear any relevance to the issues presented here.

11.     As explained by the United States Securities and Exchange Commission, Johnson's GIS scheme centered around an "insurance arbitrage strategy involving the purchase of a single premium immediate annuity [SPIA] and life insurance policy" for the benefit of investors. Specifically, upon information and belief, Johnson and the others with whom he was working would acquire not just life insurance on the lives of these senior citizens but also large annuity polices that would produce income each month that would serve as a financial hedge bet in favor of the investors in case the senior citizen insureds lived too long.

**Answer to No. 11:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

12.     Upon information and belief, these STOLI transactions were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety.

**Answer to No. 12:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

13.     Upon information and belief, the insureds who were the subject of these transactions neither wanted nor need life insurance, and did not pay anything for these policies or this insurance.

**Answer to No. 13:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint and denies that the allegations stated bear any relevance to the issues presented here.

14.     STOLI schemes violate Arizona insurable interest laws and the public policy against wagering on human life, and these schemes victimize the seniors who are induced to permit these polices to be procured on their lives.

**Answer to No. 14:**  Paragraph 14 of the Complaint does not require a response because it states legal conclusions.  To the extent a response is required, Securities Intermediary denies the allegations in paragraph 14.

15.     In short, STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of the insureds—into cash machines whereby strangers to the insureds are more interested in seeing the insureds dead than alive.

**Answer to No. 15:**  Paragraph 15 of the Complaint does not require a response because it states legal conclusions.  To the extent a response is required, Securities Intermediary denies the allegations in paragraph 15.

**The Peterson's Policy**

16.     In the mid-2000s, Howard and Eunice Peterson were husband and wife, in their early-eighties living in Sun City West, Arizona.

**Answer to No. 16:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint.

17.     Upon information and belief, in or around 2003 and 2004, Johnson and others appear to have used Mr. and Mrs. Peterson to procure a multi-million dollar life insurance policy—not for the Petersons or their family or for a legitimate insurance purpose—but rather for Johnson and others.

**Answer to No. 17:** Securities Intermediary denies the allegations contained in paragraph 17 of the Complaint.

18.     Upon information and belief, Johnson and others specifically procured a $2.5 million dollar, second to die, life insurance policy, on the lives of the Petersons, from Columbus Life (the "Policy").[2] (A copy of the Columbus Life insurance policy at issue is attached hereto as Exhibit "A.")

**Answer to No. 18:** Securities Intermediary denies the allegations contained in paragraph 18 of the Complaint.

19.     Upon information and belief, Johnson and the others did not have an insurable interest in the Petersons' lives and would not have been able to acquire the Policy had they not used the Petersons to generate the Policy in the first instance.

---

[2] A second-to die policy provides for a death benefit only after the death of the last of the two insureds to die

**Answer to No. 19:** Paragraph 19 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 19 of the Complaint.

20. Upon information and belief, specifically, on or around November 25, 2003, Johnson and the others submitted an application for life insurance to Columbus Life, purportedly executed by the Petersons.

**Answer to No. 20:** Securities Intermediary admits that Howard and Eunice Peterson executed an application for an insurance policy and submitted it to Columbus Life Insurance Company. Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 20 of the Complaint.

21. The application sought a $2.5 million policy naming the H & E Peterson Family Partnership LLLP as the initial owner and beneficiary

**Answer to No. 21:** Securities Intermediary admits the allegations contained in paragraph 21 of the Complaint.

22. In reliance upon the representations contained in the application documents and other documents and information submitted to Columbus Life, Columbus Life issued an Arizona life insurance policy, with number CM5008425U, on the lives of the Petersons. (Ex. A.)

**Answer to No. 22:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     On or about May 6, 2004, the first premium was paid on the Policy in the amount of $81,525.

**Answer to No. 23:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint.

24.     Upon information and belief, the source of this and other premium payments on the Policy was not the insureds but instead from others who lacked an insurable interest in the insureds.

**Answer to No. 24:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 24 of the Complaint.

25.     Approximately two years after the Policy was delivered and the first premium payment was made, the ownership and beneficiary designations on the Policy were changed to Church Street Nominees, Ltd.

**Answer to No. 25:** Securities Intermediary admits the allegations contained in paragraph 25 of the Complaint.

26.     On or about September 3, 2013, the ownership and beneficiary designations in the Policy were changed again, this time to Wilmington Trust.

**Answer to No. 26:** Securities Intermediary admits the allegations contained in paragraph 26 of the Complaint.

27.     On or about January 17, 2018, Howard Peterson died.

**Answer to No. 27:** Securities Intermediary admits the allegations contained in paragraph 27 of the Complaint.

28.     On or about May 1, 2020, Eunice Peterson died.

**Answer to No. 28:**  Securities Intermediary admits the allegations contained in paragraph 28 of the Complaint.

29.     Premiums continued to be made on the Policy even after both Howard and Eunice Peterson were dead, including a final premium payment in December 2020 by an account at Wells Fargo Bank, N.A., apparently on behalf of VICOF II, an investment fund managed by Vida Capital Management.

**Answer to No. 29:**  Securities Intermediary admits the allegations contained in paragraph 29 of the Complaint.

30.     A claim has been made on the Policy by Wilmington Trust.

**Answer to No. 30:**  Securities Intermediary admits the allegations contained in paragraph 30 of the Complaint.

31.     Columbus Life has investigated this claim and now believes that the Policy was procured by Johnson and others through the GIS STOLI scheme and that, under Arizona law, the Policy lacked an insurable interest prior to and at its inception and was merely a wager on the Petersons' lives.

**Answer to No. 31:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Complaint.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT –**
**ILLEGAL HUMAN LIFE WAGERING CONTRACT**

32.     Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

**Answer to No. 32:**  Securities Intermediary hereby incorporates by reference its answers to each and every allegation contained in the preceding paragraphs as if set forth herein.

33.     The Policy was applied for and executed in Arizona by Arizona citizens as insureds and by an Arizona LLLP as owner and beneficiary. The Policy was then actually delivered to the LLLP owner in Arizona. The Policy is governed by Arizona law.

**Answer to No. 33:**  Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Complaint.

34.     Arizona's Insurance Code provides that "no person shall procure or cause to be procured any insurance contract on the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured." Ariz. Rev. Stat. § 20-1104(A).

**Answer to No. 34:**  Securities Intermediary admits that the quoted language appears in Ariz. Rev. Stat. § 20-1104(A) but denies that the quoted language bears any relevance to the issues presented here.

35.     Under Arizona law, a "valid contract of insurance cannot legally be taken on the life of another by one who has no insurable interest in said life, because such a contract contravenes public policy." *Gristy v. Hudgens*, 203 P. 569, 572 (Ariz. 1922). Indeed, "[t]he

general rule of law is . . . that whatever tends . . . to be violation of a statute, and whatever is against good morals, when made the subject of a contract, is against public policy and void. It is said that they are not contracts, but unlawful agreements which are void in their inception." *San Francisco Sec. Corp. v. Phoenix Motor Co.*, 220 P. 229, 232 (Ariz. 1923) (emphasis added). Moreover, "this 'insurable interest' requirement [is] likewise [] violated when the insured is working together with an assignee to acquire an insurance policy where the circumstances indicate that the assignee is the real purchaser of the policy." *Sun Life v. Moran*, No. CV-08-0629, 2009 WL 2450443 (D. Ariz. Aug. 11, 2009).

**Answer to No. 35:** Paragraph 35 of the Complaint does not require a response because it states legal conclusions. To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 35 of the Complaint.

36. Here, upon information and belief, stranger investors were wagering on Mr. and Mrs. Peterson's life and hoping to trigger a secondary market cash-in on the Policy's $2.5 million death benefit.

**Answer to No. 36:** Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Complaint.

37. Accordingly, Columbus Life seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated Arizona law, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

**Answer to No. 37:** Securities Intermediary admits that the Plaintiff purports to seek the requested relief and otherwise denies the allegations of paragraph 37 of the Complaint.

### SECOND CAUSE OF ACTION
### DECLARATORY JUDGMENT
### LACK OF INSURABLE INTEREST

38.     Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

**Answer to No. 38:** Securities Intermediary hereby incorporates by reference its answers to each and every allegation contained in the preceding paragraphs as if set forth herein.

39.     Under Arizona law, a policy not supported by an insurable interest at its inception is void *ab initio*. *See San Francisco Sec. Corp.*, 220 P. at 232 ("It is said that they are not contracts, but unlawful agreements which are void in their inception."). Where a contract is void *ab initio* as against public policy, the contract is unenforceable and the parties to such contracts are left where they are found. *Landi v. Arkules*, 835 P.2d 458, 468 (Ariz. Ct. App. 1992).

**Answer to No. 39:** Paragraph 39 of the Complaint does not require a response because it states legal conclusions.   To the extent a response is required, Securities Intermediary denies the allegations contained in paragraph 39 of the Complaint.

40.     As set forth above, upon information and belief, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the

insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Under such circumstances, the Policy is void *ab initio*.

**Answer to No. 40:** Securities Intermediary denies that the Policy is void *ab initio*. Securities Intermediary denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 40 of the Complaint.

41.     Therefore, Columbus Life seeks, and is entitled to, a declaratory judgment that the Policy lacked an insurable interest because it was procured by and for the benefit of strangers without any insurable interest under Arizona law.

**Answer to No. 41:** Securities Intermediary admits that the Carrier purports to seek the relief requested, but denies the remainder of the allegations contained in paragraph 41 of the Complaint.

WHEREFORE, Columbus Life respectfully requests the entry of Judgment by this Court as follows:

a. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Mr. and Mrs. Peterson;

b. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

c. Declaring that because the Policy is void *ab initio* it never existed;

d. Declaring the [sic] because the Policy is void *ab initio* the Court will leave the parties to this illegal contract as it finds them, thus permitting Columbus Life to retain the premiums paid on the Policy, or, in the alternative, declaring that Columbus Life may retain some or all of the premiums paid on the Policy to

effectuate an offset with respect to Columbus Life's costs and losses associated

with the Policy;

e. Awarding Columbus Life attorneys' fees and costs associated with bringing this

lawsuit, as determined by the Court; and

f. Awarding Columbus Life any further relief this court deems appropriate.

**Answer to Final Paragraph**: Securities Intermediary admits that the Plaintiff purports to seek the requested relief and otherwise denies the allegations of the final paragraph of the Complaint.

## DEFENSES

Securities Intermediary asserts the following defenses to the claims set forth in the Complaint. Securities Intermediary reserves its right to assert defenses other than those set forth below of which it becomes aware through discovery or other investigations as may be appropriate at a later time.

## FIRST DEFENSE
### (*Failure to State a Claim*)

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE
### (*Statute of Limitations*)

Plaintiff's claims for relief are barred, in whole or in part, by the applicable statute(s) of limitation and/or by the contestability period set forth in the Policy.

**THIRD DEFENSE**
(*Waiver, Ratification, Laches, Unclean Hands, In Pari Delicto*)

Plaintiff's claims for relief are barred, in whole or in part, by the doctrines of waiver, laches, unclean hands and *in pari delicto*. Plaintiff, on information and belief, has been aware or should have been aware of the facts that it contends justify rescission of the Policy (and/or a declaration that the Policy is void) long before it received a claim for the Policy's death benefit. Yet, with such actual or constructive knowledge, Plaintiff issued the Policy, accepted premiums for the Policy, and otherwise treated the Policy as if it was valid and enforceable at all times prior to receiving the claim; and took no action to rescind and/or void the Policy until after receiving that claim, all to the material damage and detriment of Securities Intermediary and its customer, a securities entitlement holder, on whose behalf Securities Intermediary owns the Policy.

**FOURTH DEFENSE**
(*Unjust Enrichment*)

Plaintiff's claims are barred in whole or part by the doctrine of unjust enrichment.

**FIFTH DEFENSE**
(*Uniform Commercial Code*)

Plaintiff's claims for relief against Securities Intermediary are precluded by the Uniform Commercial Code.

**SIXTH DEFENSE**
(*Incontestability*)

As Securities Intermediary argues in its fully briefed Motion for Judgment on the Pleadings (ECF No. 41), Plaintiff's claims are barred by Ariz. Rev. Stat. Ann. §§ 20-1204 and 20-1217 and *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 89 Ariz. 253, 256, 360 P.2d

1030, 1032 (1961) ("every exception to incontestability not expressed in the statute itself is specifically barred as a defense to the policy after the expiration of the incontestability period.").

### SEVENTH DEFENSE
(*Unlawful Wagering*)

Plaintiff's claims are barred because Arizona public policy does not permit one who knowingly participates in and facilitates an unlawful human life wager to profit from the wager. Columbus Life issued the Peterson Policy in 2003, knew by no later than 2006 of the facts upon which it bases its allegation that the Peterson Policy lacked insurable interest as an unlawful wager, flagged the Peterson Policy internally as potentially lacking insurable interest by no later than 2006, yet chose not to challenge the validity of the Peterson Policy until it commenced this action in 2021. Thus, to the extent the Peterson Policy is somehow contestable and void as an unlawful human life wager, which claim is invalid for the reasons set forth herein, Columbus Life directly and intentionally created, participated in, and has sought to profit from that wager. As a result of Columbus Life's conduct and participation in an alleged unlawful human life wager, the Peterson Policy must be enforced against Columbus Life to prevent a participant in an unlawful wager from profiting from that wager, and Securities Intermediary (and its customer on behalf of which it owns the Littlejohn Policy) are entitled to a full refund of all premiums paid, plus applicable interest.

## COUNTERCLAIMS

Wilmington Trust, N.A., as Securities Intermediary, as and for its counterclaims, pursuant to Rule 13 of the Federal Rules of Civil Procedure, asserts against Columbus Life Insurance Company and alleges upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

1.      In November of 2003, Howard and Eunice Peterson (the "Insureds"), submitted an application for life insurance to Columbus Life Insurance Company ("Columbus Life"). The Application made clear that the owner and beneficiary of the proposed policy would be the H&E Peterson Family Partnership, LLLP (the "Partnership"). Columbus Life determined that the Partnership had an insurable interest in the Petersons' lives, agreed to insure the Petersons, and issued a "second to die" policy number CM5008425U carrying a $2,500,000 million death benefit (the "Policy"), with the Partnership as the initial owner and beneficiary.

2.      Under the Policy, Columbus Life agreed to pay the Policy death benefit after both Insureds had died.

3.      The Petersons have died; Securities Intermediary timely submitted a claim for the death benefit under the Policy to Columbus Life, but Columbus Life has wrongfully failed to pay the death benefit due and owing. Instead, Columbus Life commenced a time-barred lawsuit against Securities Intermediary seeking to rescind the Policy on the ground that the Policy is an unlawful human life wager that was procured as part of an illegal stranger originated life insurance ("STOLI") scheme, and, therefore, in violation of applicable insurable interest laws, because the Partnership exercised its right to sell the

Policy for money in 2006. But Columbus Life's suit is specifically foreclosed by Arizona's incontestability statutes (Ariz. Rev. Stat. Ann. §§ 20-1204 and 20-1217) and Arizona Supreme Court's holding in *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 89 Ariz. 253, 256, 360 P.2d 1030, 1032 (1961) ("every exception to incontestability not expressed in the statute itself is specifically barred as a defense to the policy after the expiration of the incontestability period.").

4.    Over the course of fifteen years – from April 2006 through April 2021 – Columbus Life specifically and repeatedly represented that the Policy was "in force" and incontestable, despite its knowledge of the facts that it has pled in its complaint here: that the Policy was sold for money 29 months after it was issued, and was held by investors in the secondary market. If these facts somehow render the Policy void due the lack of insurable interest, it is Columbus Life that has engaged in human life wagering by knowingly allowing the Policy to remain in force, by collecting premium from innocent owners to which it represented the Policy was in force, and by failing to take any action to rectify the conduct of its own agent, the alleged purveyor of the so-called "STOLI" scheme. Indeed, Columbus Life continued to pay commission to the agent who it now contends committed the unlawful conduct which presumably is violative of public policy. Columbus Life admits it has participated in what it claims to be unlawful activity, and asks this Court to allow it to profit from its wrongdoing by declaring the Policy void and allowing Columbus Life to retain all premium it has been paid. ECF No. 1 at WHEREFORE, ¶¶ a.-d.

5.      In fact, the Policy was supported by an insurable interest when it was issued, as Columbus Life correctly determined during the Policy's underwriting in 2003. The Partnership had an insurable interest in the Petersons' lives because they were general and limited partners in the Partnership, which had an economic interest in their continued life. Despite this fact, Columbus Life continues to prosecute its suit against Securities Intermediary in bad faith.

6.      Furthermore, even if the Policy were contestable and void *ab initio* as an unlawful human life wager lacking insurable interest as Columbus Life now alleges, Securities Intermediary has also discovered facts in this lawsuit that demonstrate that Columbus Life knew or recklessly disregarded the risk that the Policy was an unlawful human life wager since at least 2006 but nevertheless demanded, received, and accepted premiums, and represented to Securities Intermediary in writing that the Policy was valid and enforceable for years after having such knowledge.

7.      In contrast to Columbus Life, Securities Intermediary, acting for its customers that lawfully invest in secondary market policies, is an innocent acquirer of the Policy. Securities Intermediary's client, a securities entitlement holder, acquired the Policy legitimately in the life insurance market as a bona fide purchaser for value, and retained Securities Intermediary to hold title to the Policy with the life insurance company. Securities Intermediary became the owner and beneficiary of record of the Policy ten years after the Policy had been issued, and neither it nor its customer were involved with the procurement of the Policy or any of the alleged STOLI activity about which Columbus Life now complains.

8. This lawsuit seeks to put Columbus Life's deceptive and unfair insurance trade practices to an end. The Policy is incontestable, as Securities Intermediary argues in its pending Motion for Judgment on the Pleadings (ECF No. 41), and it is in any event valid, as the initial owner had an insurable interest in the Petersons' lives. However, to the extent the Policy is somehow contestable and void as an unlawful wager on human life, as Columbus Life alleges, Columbus Life must be held accountable for its misrepresentations of the Policy's validity as well as its intentional participation in the very unlawful human life wager about which it now complains.

9. To the extent the Policy is contestable and void *ab initio*, as Columbus Life alleges, then the Policy must be enforced against Columbus Life to further Arizona's prohibition on unlawful human life wagering. Columbus Life has known or recklessly disregarded the risk that the Policy was an unlawful wager lacking insurable interest since at least 2006. The Company specifically identified and internally tracked the Policy as a potential STOLI policy and the insurance agent, Reid Johnson, as a suspected producer of STOLI policies, yet did nothing to rescind the Policy or stop the alleged wager. In contrast to Columbus Life's intentional participation in an unlawful human life wager, Securities Intermediary is an innocent acquirer whose customer purchased the Policy in a lawful acquisition without the information that Columbus Life possessed—information Columbus Life disregarded in order to collect as much premium as possible.

10. Arizona's Insurance law and public policy does not permit an insurance company to participate in an unlawful human life wager for fifteen years, misrepresent the status of the Policy, demand and collect premium from an innocent purchaser of the Policy,

reap profits and investment income from the proceeds of the wager, and then renege on its promise to pay and leave the innocent purchaser with nothing. To permit such conduct would not prevent unlawful wagering—it would endorse and promote it, by incentivizing insurance companies to issue and keep suspected STOLI policies in force and collect premiums on them for many years, while secretly intending to renege on them at some point of their choosing.

11. Accordingly, this lawsuit seeks compensatory and punitive damages, and applicable interest, for the Columbus Life's intentional breach of contract and failure to pay the Policy death benefit and as damages for the Columbus Life's bad faith and negligent conduct.

## **THE PARTIES**

12. Securities Intermediary is the current owner and beneficiary of record of the Policy, in its capacity as securities intermediary on behalf of its customer, a securities entitlement holder. Securities Intermediary is a national banking association organized and existing under federal law with its main office located in Wilmington, Delaware, as identified in its Articles of Association. Securities Intermediary maintains a principal place of business in Delaware. Securities Intermediary is not a citizen of Ohio for purposes of diversity jurisdiction.

13. At all times herein Securities Intermediary acts solely as securities intermediary for a third-party investor, and does not act in its individual capacity. *See, e.g.,* Ariz. Rev. Stat. Ann. § 47-8102(A)(14) (defining role of securities intermediary).

14.     Based on the allegations in the Complaint, Columbus Life is an Ohio corporation with its principal places of business in Ohio.

## JURISDICTION & VENUE

15.     Based on the allegations in the Complaint, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based upon the diversity of citizenship of the parties, and the amount in controversy exceeding $75,000, exclusive of interest and costs.

16.     Based on the allegations in the Complaint, venue lies within this District under the provisions of 28 U.S.C. § 1391(a)(1), (a)(2), and 1391(b) because Columbus Life conducts business in the District of Arizona and a substantial part of the events and/or omissions giving rise to Securities Intermediary's claims against Columbus Life occurred within this District.

## FACTS

17.     On or about November 25, 2003, Howard and Eunice Peterson completed an application for the Policy and submitted it to Columbus Life.

18.     The application listed the initial owner and beneficiary of the Policy as the H & E Peterson Family Partnership, LLLP (the "Partnership").

19.     The Partnership was a family investment partnership that the Petersons established to engage in investing activities, including "the acquisition, holding, management, trading and disposition of insurance contracts, annuity contracts, stocks, bonds, investment contracts and other instruments and properties, either directly or through other entities, for investment and the production of income." Ex. A at SP_000034 (§ 1.2).

20. The Petersons were each general and limited partners in the Partnership. *Id*. at SP_000034-35 (§ 1.4), SP_000047.

21. Altair, LLC was also a general partner in the Partnership. Reid Johnson, the writing agent on the Policy was the President of Altair.

22. The Partnership had an insurable interest in the Petersons' lives.

23. In December 2003, and in connection with the application for the Policy, the Peterson's accountant, Jeff Clark, CPA, informed Columbus Life that the Petersons would utilize "an annuity/life insurance combination to create additional income."

24. From 2003 to the present, Columbus Life has permitted a policy owner to fund premium for a life insurance policy it owns on the life of an insured with payments from an annuity also issued on that insured's life.

25. In early 2004, Columbus Life issued the Policy, back dating it with a policy date of October 26, 2003.

26. The Policy states "[t]his Policy is a contract between You [the Policy owner] and Us [Carrier] to insure the joint lives of the Insureds." ECF No. 1-1 at 19 of 40.

27. The Policy states that the "We [the Carrier] will pay the Death Benefit as described in the Payment of Proceeds section when We receive proof that both insureds died while this policy was in force, and any other proof that We may require in order to investigate the claim." ECF No. 1-1 at 20 of 40.

28. The Policy contains an "incontestability" clause required by Arizona Insurance Law in a section titled "Limits on Our Contesting This Policy", which states that "We [Columbus Life] will not contest this policy to the extent of the Specified Amount

after it has been in effect during both Insured's lifetimes for two years from the Policy Date." ECF No. 1-1 at 34 of 40.

29.    The Policy also states that "Our [Columbus Life's] right to contest beyond these two year periods is limited to the Insured(s) who died during such period. The policy or rider is incontestable with respect to the Insured(s) who survived the two-year period." ECF No. 1-1 at 35 of 40.

30.    The "Specified Amount" is defined in the Policy as the amount of insurance coverage the policy owner selected, as shown in the Policy Schedule. ECF No. 1-1 at 17 of 40.

31.    The Specified Amount of the Policy is $2,500,000. ECF No. 1-1 at 4 of 40.

32.    On October 23, 2005, the Policy became incontestable under the terms of its incontestability clause and Arizona Insurance law.

33.    On or about April 19, 2006, the Partnership sold the Policy to Lifetrust, LLC ("Lifetrust") for the sum of $575,000 pursuant to a Life Insurance Policy Purchase and Sale Agreement.

34.    The Partnership was paid $99,738.00 of the Policy sale proceeds and $475,262 was paid directly to Liberty Life of Boston, an annuity company, which payment was used to purchase an annuity on one or both of the Petersons' lives that benefitted the Petersons and/or their family members.[3]

---

[3] "An annuity is generally understood as an agreement to pay a specified sum to the annuitant annually during life." *Corp. Comm'n v. Equitable Life Assur. Soc. of U.S.*, 73 Ariz. 171, 175, 239 P.2d 360, 362 (1951)

35.     In connection with the Life Insurance Policy Purchase and Sale Agreement, Howard and Eunice Peterson each executed an Acknowledgment in which they represented that they were of sound mind, had reviewed and consented to the sale agreement, and had not made any covenant, representation or warranty in any application for the Policy that was untrue.

36.     On or about May 2, 2006, Columbus Life received change of ownership and beneficiary forms executed by the Partnership requesting that the company change the record owner and beneficiary of the Policy to Church Street Nominees Limited.

37.     Reid Johnson executed the change of owner and beneficiary forms on behalf of the Partnership and signed as "President"; Jeffrey Clark signed as "Manager."

38.     On or about May 2, 2006, Columbus Life also received a Corporate Resolution of Altair, LLC, reflecting that it was a general partner in the Partnership, the Partnership intended to sell the Policy, Reid Johnson was the sole director of Altair, and Jeffrey Clark was an officer of Altair and was authorized to execute such documents on behalf of Altair LLC as are necessary to sell the Policy to Lifetrust.

39.     On May 8, 2006, Columbus Life processed the change of policyowner and beneficiary forms to change the record owner and beneficiary of the Policy to Church Street Nominees Limited without objection or inquiry.

40.     On or about September 3, 2013, Columbus Life received and processed without objection or inquiry a request to change the owner and beneficiary of the Policy to Securities Intermediary.

41.     Since 2013, Securities Intermediary has held the Policy in a securities account for the benefit of a customer, which, at all times, has been a securities entitlement holder. Securities Intermediary's current customer acquired the Policy legitimately in the tertiary life insurance market as a bona fide purchaser for value, acquired all right title and interest in the Policy, and retained Securities Intermediary to hold title to the Policy with the life insurance company.

42.     Neither Securities Intermediary, nor its customer, had any involvement in the original procurement of the Policy.

43.     Before Securities Intermediary acquired the Policy on behalf of its customer, Columbus Life completed verifications of coverage concerning the Policy, including a Life Insurance Policy Asset Verification Questionnaire.

44.     Specifically, on or around December 27, 2012, Columbus Life completed a form titled "INFORMATION TO BE VERIFIED" in which Columbus Life stated, among other things, that the Policy was "in force" and verified that the Policy was "beyond the contestability period."

45.     Columbus Life never disclosed in the verifications of coverage described above that it believed the Policy was void *ab initio* and lacking insurable interest because the Petersons had utilized an annuity arbitrage strategy or because the Policy or the Partnership allegedly benefitted individuals lacking an insurable interest in the Peterson's lives.

46.     From the inception of the Policy through today, Columbus Life provided the Policy's owners with numerous Verifications of Coverage on the Policy — in addition to

those described in paragraph 44 above — which represented, among other things, premium payments that would be necessary to keep the Policy "in force" and that the Policy was "In-Force," "Active," "Premium Paying" and/or that the contestability period had expired, including on or around the following dates: December 27, 2012; February 6, 2015; April 19, 2016; December 6, 2016; October 31, 2017; December 19, 2017, January 3, 2018; January 31, 2018; February 5, 2018; February 28, 2018; March 30, 2018; May 30, 2018; July 8, 2018; July 10, 2018; October 6, 2018; October 30, 2018; December 4, 2018; January 9, 2019; February 5, 2019; March 4, 2019; May 9, 2019; June 18, 2019; July 10, 2019; August 21, 2019; September 10, 2019; September 30, 2019; January 16, 2020; March 17, 2020; April 11, 2020; June 29, 2020; September 10, 2020.

47. Columbus Life never disclosed in any verifications of coverage described in paragraphs 44 and 46 above that it believed the Policy was void *ab initio* and lacking insurable interest because the Petersons had utilized an annuity arbitrage strategy or because the Partnership or the Policy benefitted individuals lacking an insurable interest in the Peterson's lives.

48. From the inception of the Policy through today, Columbus Life provided the Policy's owners with numerous "In-Force Policy Illustrations" on the Policy which represented, among other things, the Policy's "Status," a summary of coverage provided under the Policy, and that premium payments that would be necessary to keep the Policy "in force," including on or around the following dates: November 25, 2003; April 28, 2004; February 6, 2006; September 9, 2006; January 2, 2007; July 26, 2007; February 2, 2009; January 19, 2011; October 18, 2012; December 31, 2012; October 31, 2014; November 5,

2014; October 30, 2015; September 26, 2016; August 16, 2018; October 24, 2018; April 24, 2019; January 23, 2020; and October 22, 2020.

49.     Columbus Life never disclosed in the In-Force Policy Illustrations described above that it believed the Policy was void *ab initio* and lacking insurable interest because the Petersons had utilized an annuity arbitrage strategy or because the Policy or the Partnership benefitted individuals lacking an insurable interest in the Peterson's lives.

50.     From the inception of the Policy through today, Columbus Life issued Annual Reports on the Policy, as expressly required under the Policy's "General Provisions" (ECF No. 1-1, p. 34 of 40), including on or around the following dates: October 24, 2005; October 25, 2006; October 25, 2007; October 25, 2008; October 25, 2009; October 25, 2010; October 25, 2011; October 25, 2012; October 25, 2013; October 25, 2014; October 25, 2015; October 25, 2016; October 25, 2017; October 25, 2018; October 25, 2019; October 25, 2020.

51.     The Annual Reports described above represented the "Current Insured Death Benefit" as $2,500,000 and the "Policy value" as "$2,500,000" "if planned premiums are paid on time."

52.     Columbus Life never disclosed in the Annual Reports described above that it believed the Policy was void *ab initio* and lacking insurable interest because the Petersons had utilized an annuity arbitrage strategy or because the Partnership or the Policy benefitted individuals lacking an insurable interest in the Peterson's lives.

53.     Relying on these communications from Columbus Life, which it made from 2005 through 2020, Securities Intermediary and its customer understood that Securities

Intermediary (as a securities intermediary under the UCC) and its customer (as the beneficial owner of the Policy) owned a valid, incontestable, in-force policy insuring the Petersons' lives, and that Columbus Life would pay the $2,500,000 death benefit upon the death of the Petersons, as long as all premiums were paid.

54. Securities Intermediary and its customer would not have continued to pay the premiums to keep the Policy in force in the absence of Columbus Life's representations, and Securities Intermediary's customer would not have purchased the Policy in 2013 in the absence of Columbus Life's representations.

55. All premiums due on the Policy from inception of the Policy through today have been duly and timely paid to Columbus Life.

56. On or about January 17, 2018, Howard Peterson died.

57. On or about May 1, 2020, Eunice Peterson died.

58. On or about December 29, 2020, Securities Intermediary submitted a death claim to Columbus Life under the Policy on behalf of the policy's beneficial owner.

59. Columbus Life has not paid the death claim.

60. Instead, Columbus Life filed this lawsuit alleging that the company "has investigated this claim and now believes that the Policy was procured by Johnson and others through the GIS STOLI scheme" perpetrated by Reid Johnson and Jeffrey Clark and involved the purchase of an annuity and the Policy on the lives of the Petersons, which benefitted investors rather than someone with an insurable interest in the Petersons' lives. ECF No. 1, ¶¶ 9-10.

61.     Significantly, all of the information to which Columbus Life refers in support of its supposed determination that the Policy lacked insurable interest at inception, including the Petersons' use of an annuity arbitrage arrangement, the identity of the Policy owner and beneficiaries, and the involvement of a particular agent, Reid Johnson – is information that Columbus Life has known and was monitoring long before the insureds' death. *Id*. at ¶¶ 9-11, 31.

62.     Contrary to Columbus Life's allegations, Columbus Life has been closely monitoring what it believed to be STOLI policies since as early as 2006, when it terminated the Policy's writing agent, Reid Johnson. Columbus Life flagged the Policy as a potential STOLI policy when it discovered the Policy had been sold in 2006, and continuously treated the Policy as a potential STOLI policy through the date it commenced litigation in April of 2021.

63.     Columbus Life has monitored potential STOLI policies as part of a strategy to identify purported STOLI policies it knows it will challenge, while representing to the policies' owners that the policies were in-force and incontestable.

64.     In 2006, Columbus Life began monitoring policies that it suspected of being STOLI based on certain red flags, including policies with a high face amount, ownership changes early in the life of the policy, an elderly insured at the time the policy was issued, and ownership by an entity with no obvious connection to the insured, as well as insurance agents suspected of originating STOLI policies.

65.     On July 31, 2006, Columbus Life terminated Reid Johnson its appointed agent due to his alleged origination of STOLI policies.

66.    As part of its investigation into STOLI policies and producers, Columbus Life identified Johnson as an alleged producer of STOLI policies who had served as Columbus Life's agent for the origination of several dozen policies, with a total of over $27,000,000 in face value.

67.    Despite Johnson's conduct as an allegedly prolific STOLI producer, and Columbus Life's awareness of his purported conduct, Columbus Life has not taken any legal action against him.

68.    Instead, Columbus Life has paid and continues to pay renewal commissions to Reid Johnson on the same policies that the company considers unlawful STOLI policies.

69.    By no later than 2006, Columbus Life included the Policy on a list of life insurance policies that it suspects are STOLI.

70.    Although Columbus Life identified the Policy as having certain characteristics of a STOLI policy and Reid Johnson as a suspected STOLI producer no later than 2006, the company did not take any action to rescind the Policy or contact Securities Intermediary to inform it of the these suspicions.

71.    Instead, Columbus Life continued to demand and collect premium on the Policy and continued to send Verifications of Coverage, In-Force Policy Illustrations, and Annual Reports representing that the Policy was in-force and incontestable.

72.    If Securities Intermediary and its customer had known that Columbus Life considered the Policy to be contestable based on a lack insurable interest even though the Policy had been in force for two years during the lives of the insureds, Securities

Intermediary's customer would not have purchased the Policy and would not have paid premium on the Policy.

73.     If Securities Intermediary and its customer had known that Columbus Life had undertaken a detailed, years-long internal investigation into so-called STOLI policies beginning in 2006, terminated Reid Johnson in 2006, and identified the Policy itself as a potential STOLI policy, Securities Intermediary's customer would not have purchased the Policy in 2013 or continued to pay premium on the Policy thereafter.

74.     Columbus Life's past conduct of sending Securities Intermediary Annual Reports, Verifications of Coverage, In-Force Policy Illustrations, and premium and lapse notices in and after 2006 and until a death claim was submitted to it under the Policy, each of which represented to Securities Intermediary, and its customer, that Columbus Life believed the Policy to be valid and enforceable, are past acts that were committed with the intent to induce Securities Intermediary its customer to believe that Columbus Life considered the Policy to be valid and enforceable, and to induce Securities Intermediary and its client to continue to pay premiums for the Policy.

75.     Columbus Life has also known for many years of all of the facts supporting its supposedly recent determination that the Policy is a so-called STOLI policy lacking insurable interest.

76.     During the Policy's underwriting in 2003, over 18 years ago, Columbus Life learned from the Peterson's CPA and financial planner, Jeffrey Clark, that the Petersons would utilize an "Estate Enhancer Plus" strategy and "an annuity/life insurance combination to create additional income" for the Petersons.

77.     Columbus Life permits policy owners to purchase a life insurance policy and fund premium on that policy with payments made pursuant to an annuity and permitted that practice when the Policy was applied for and issued.

78.     As early as 2006, the same year it terminated Reid Johnson, Columbus Life also learned that Altair LLC was a general partner in the Partnership and that Reid Johnson, the agent, and Jeff Clark were officers of that entity and involved in the Policy's sale to Lifetrust.

## FIRST COUNTERCLAIM AGAINST COLUMBUS LIFE
### (Breach of Contract)

79.     Securities Intermediary repeats and realleges each and every allegation above as it fully set forth herein.

80.     The Policy, by its terms, provides that Columbus Life shall make payment of the Policy's death benefit once it received "proof that both insureds died while this policy was in force, and any other proof that We [Columbus Life] may require in order to investigate the claim;" and that Columbus Life shall be barred from challenging the validity of the Policy after it has been in effect during both of the insureds' lifetimes for two years from its Policy Date.

81.     The Policy further states that Columbus Life's "right to contest beyond these two-year periods is limited to the Insured(s) who died during such period. The policy or rider is incontestable with respect to the Insured(s) who survived the two-year period." ECF No. 1-1, p. 35 of 40.

82.     The Policy became incontestable on October 23, 2005.

83.     Following the Petersons' deaths, Securities Intermediary sent Columbus Life proof of the Petersons' deaths, and otherwise provided the Carrier with all other information that it needed in order to process the death claim on behalf of the Policy's beneficial owner.

84.     Columbus Life has failed to pay the Policy's death benefit to Securities Intermediary.

85.     Columbus Life took no action to rescind and/or contest the validity of the Policy until after receiving the death claim.

86.     Columbus Life therefore breached the terms of the Policy by failing to pay the Policy's death benefit and applicable interest to Securities Intermediary.

87.     Columbus Life further breached the terms of the Policy by commencing its Arizona lawsuit challenging the validity of the Policy, even though the Policy had been in force during the Insureds' lifetimes for more than two years from the Policy's issue date.

88.     Securities Intermediary has performed all its duties and obligations under the Policy.

89.     As a result of the aforementioned breaches by Columbus Life, Securities Intermediary (and its customer on behalf of which it owns the Policy) has been damaged in a sum to be determined by the trier of fact after trial, which damages include, but are not limited to, $2,500,000, representing the principal amount of the Policy's death benefit, plus applicable interest, as well as the fees and costs that Securities Intermediary has incurred and will continue to incur as a result of Columbus Life's wrongful conduct in belatedly challenging the validity of the Policy.

## SECOND COUNTERCLAIM AGAINST COLUMBUS LIFE
### (Bad Faith)

90.    Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

91.    Columbus Life issued the Policy with a policy date of October 26, 2003.

92.    Securities Intermediary is the record owner and beneficiary of the Policy with the Columbus Life.

93.    Following the Insureds' deaths, Securities Intermediary timely submitted a death claim to Columbus Life on behalf of the Policy's beneficial owner.

94.    Securities Intermediary has performed all of its obligations under the Policy.

95.    Columbus Life has intentionally failed to pay the death claim.

96.    Columbus Life (i) lacks any reasonable basis on which to deny Securities Intermediary's claim for the Policy death benefit, and (ii) knows—or has recklessly disregarded the existence—of such absence of a reasonable basis on which to deny Securities Intermediary's claim.

97.    Columbus Life lacks any reasonable basis for denying Securities Intermediary's claim for the Policy death benefit because Columbus Life has knowingly and intentionally: (a) refused to pay Securities Intermediary's death claim without conducting a reasonable investigation and/or based on incorrect assertions of fact and in reliance on facts of which it has been aware, but has chosen to ignore, in collecting and accepting premium payments on the Policy; (b) represented that the Policy was valid and enforceable, and demanded that additional premium payments be made by Securities

Intermediary to Columbus Life to keep the Policy in force, all the while intending to seek to rescind the Policy after receiving a death claim and intending also to make a claim in court to keep all premiums paid for the Policy; (c) forced Securities Intermediary to litigate this action in order to compel Columbus Life's performance under the Policy; (d) failed to adopt and implement reasonable standards applicable to the Policy for prompt investigation and payment of claims; (e) lied to Securities Intermediary regarding its claim-handling; (f) failed to promptly pay the death claim even though Columbus Life's liability is clear; (g) failed to return unearned premium paid after the Insureds had died; (h) misrepresented the terms and status of the Policy, including that the Policy was incontestable, in violation of Arizona law and Ariz. Rev. Stat. Ann § 20-443; (i) challenged the Policy in clear violation of Ariz. Rev. Stat. Ann. § 20-1204 and 20-1217, Arizona's incontestability statutes, and Columbus Life's express representations in the Policy.

98.    Securities Intermediary (and its customer on behalf of which it owns the Policy) has directly suffered a loss of money or property caused by Columbus Life's unfair, unreasonable and deceptive acts or practices. Columbus Life has failed and refused to pay to Securities Intermediary the $2,500,000 death benefit promised in the Policy, even though the Carrier has been paid at least $1,611,156.08 in premium.

99.    Columbus Life has also failed to return the Policy premium paid by Securities Intermediary. ECF No. 1 at ¶ 29.

100.    Columbus Life intended to deceive Securities Intermediary and its customer into believing that Columbus Life would not challenge the validity of the Policy in order to continue to collect premium payments from Securities Intermediary and its customer,

while knowing that Columbus Life would challenge the validity of the Policy as an alleged STOLI policy once the Insureds died or neared 100 years old and premiums were no longer due.

101.     Columbus Life's unfair or deceptive acts or practices described above were intentional or knowing violations or undertaken with such reckless disregard that such knowledge may be imputed to Columbus Life.

## THIRD COUNTERCLAIM AGAINST COLUMBUS LIFE
### (Promissory Estoppel)

102.     Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

103.     Columbus Life issued the Policy with a policy date of October 26, 2003.

104.     Columbus Life alleges that the Policy is void.

105.     Columbus Life, with full knowledge that Securities Intermediary was the Policy's owner and beneficiary of record, represented that the Policy was valid, in force, and incontestable and induced Securities Intermediary (and its customer on behalf of which it owns the Policy) to purchase the Policy, pay Columbus Life substantial premiums on the Policy, even though Columbus Life had already investigated the Policy and suspected that the Policy was a STOLI policy that lacked insurable interest.

106.     Columbus Life accepted premium payments on the Policy and otherwise treated it as if it was valid and enforceable at all times prior to receiving the premiums from Securities Intermediary.

107.    Columbus Life acted in a manner that has caused Securities Intermediary (and its customer on behalf of which it owns the Policy) to reasonably believe that the Policy was a valid and enforceable life insurance policy for which the death benefit would be duly paid upon the death of the Policy's insured because the Carrier: issued the Policy; accepted premium for the Policy; represented that the Policy was in-force and beyond the contestability period; and otherwise treated the Policy as if it was valid and enforceable at all times prior to receiving the death claim.

108.    Columbus Life took no action to rescind and/or contest the validity of the Policy until after receiving the death claim.

109.    Securities Intermediary's (and its customer on behalf of which it owns the Policy) belief that the Policy was valid, incontestable, and enforceable was reasonable and a foreseeable result of Columbus Life's conduct.

110.    Columbus Life has been aware of the facts that it contends justify a rescission of the Policy (and/or a declaration that the Policy is void) since before it issued the Policy, or shortly after it issued the Policy, but well before it received the death claim and well before it commenced its lawsuit to rescind and/or void the Policy and keep all premiums paid.

111.    Columbus Life filed its lawsuit alleging that the Policy is void.

112.    As a result of the Columbus Life's conduct, Securities Intermediary (and its customer on behalf of which it owns the Policy) has been damaged in a sum to be determined by the trier of fact after trial, which damages include, but are not limited to, $2,500,000, representing the principal amount of the Policy's death benefit, plus applicable

interest, as well as the fees and costs Plaintiff has incurred and will continue to incur as a result of the Columbus Life's wrongful conduct in challenging the validity of the Policy.

## FOURTH COUNTERCLAIM AGAINST COLUMBUS LIFE
### (Negligent Misrepresentation)

113. Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

114. Columbus Life issued the Policy with a policy date of October 26, 2003.

115. Columbus Life alleges that the Policy is void.

116. In 2003 when the Policy was issued, Columbus Life represented in the Policy itself that Columbus Life "will not contest this policy to the extent of the Specified Amount after it has been in effect during both Insured's lifetimes for two years from the Policy Date."

117. Columbus Life further represented that its "right to contest beyond these two-year periods is limited to the Insured(s) who died during such period. The policy or rider is incontestable with respect to the Insured(s) who survived the two-year period." ECF No. 1-1, p. 35 of 40.

118. If the Policy is, in fact, contestable and void, then Columbus Life's representations it made to Securities Intermediary in the Policy were false.

119. Columbus Life identified the Policy as a suspected STOLI policy that lacked insurable interest at the time it was issued and was therefore void.

120. From 2013 to the time Columbus Life filed this lawsuit, Columbus Life represented to Securities Intermediary that the Policy was valid and in-force by consenting to and approving the subsequent transfer of the Policy to Securities Intermediary; by

accepting premiums for the Policy from Securities Intermediary for more than five years; and by repeatedly representing to Securities intermediary through Verifications of Coverage, Annual Reports, In-Force Policy Illustrations that the Policy was in force and incontestable.

121.    If the Policy is, in fact, contestable and void, then Columbus Life's representations were false.

122.    Columbus Life knew or suspected by no later than 2006 that the Policy was an unlawful STOLI policy but nevertheless represented to Securities Intermediary that the Policy was valid and incontestable.

123.    Columbus Life has acted in a manner that has caused Securities Intermediary (and its customer on behalf of which it owns the Policy) to reasonably and justifiably believe that the Policy was a valid and enforceable life insurance policy for which the death benefit would be duly paid upon the death of the Policy's insureds because Columbus Life: issued the Policy; transferred ownership of the Policy to Securities Intermediary; accepted premium for the Policy; represented that the Policy was in-force and beyond the contestability period; and otherwise treated the Policy as if it was in effect, incontestable, valid, and enforceable at all times prior to receiving the death claim.

124.    Columbus Life failed to exercise reasonable care when it represented to Securities Intermediary that the Policy was valid, incontestable and in-force even though the company had determined or suspected that the Policy was a purportedly STOLI policy lacking insurable interest.

125. Columbus Life's representations were provided in connection with Securities Intermediary's and its customer's acquisition and ownership of the Policy, which constitutes a business transaction.

126. Securities Intermediary (and the customer on behalf of which Securities Intermediary owns the Policy) reasonably and justifiably relied on Columbus Life's representations when it acquired the Policy and paid premium to Columbus Life in order to keep the Policy in force on behalf of its customer.

127. Columbus Life intended for Securities Intermediary (and the customer on behalf of which Securities Intermediary owns the Policy) to rely and knew that Securities Intermediary would rely on the company's representations that the Policy was in force, incontestable, valid, and enforceable at all times prior to receiving the death claim.

128. As a result of Columbus Life's conduct, Securities Intermediary's customer, on whose behalf Securities Intermediary owns the Policy, has incurred substantial damages as a result of Columbus Life's negligent and wrongful conduct, including, among other things, (a) the purchase price that Securities Intermediary paid in acquiring the Policy in 2013, (b) the costs and expenses of maintaining the Policy from 2013 through 2020, including but not limited to premium payments and other third-party servicing fees, and (c) the costs and expenses of this litigation.

129. Securities Intermediary, on behalf of its customer, is entitled to actual, incidental, and consequential damages in the amount of (a) the purchase price Securities Intermediary's customer paid to acquire the Policy, (b) the premium payments that Columbus Life deceived Securities Intermediary, on behalf of its customer, into paying,

(c) the additional costs and expenses that Securities Intermediary's customer paid to service the Policy over eight years, and (d) the costs and expenses of this litigation.

130.    Securities Intermediary, on behalf of its customer, is also entitled to punitive damages on the basis of Columbus Life's wrongful conduct detailed above, as well as Columbus Life's negligent and wrongful conduct in seeking to enrich itself by misrepresenting the Policy's validify and its intention to collect as many premium payments as possible before challenging the validity of the Policy.

## FIFTH COUNTERCLAIM AGAINST COLUMBUS LIFE
### (Return of Premium)

131.    Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

132.    Columbus Life issued the Policy with a policy date of October 26, 2003.

133.    Columbus Life alleges that the Policy is void.

134.    All premiums due on the Policy have been timely and fully paid, and Columbus Life has received a total amount of at least $1,611,156.08 in premium payments on the Policy.

135.    To the extent the Policy is somehow contestable and void, which claim is invalid for the reasons set forth above and in ECF No. 41, no coverage would have ever attached and, therefore, the premiums paid to Columbus Life in connection with the Policy over the past 18 years that the Policy was in effect would not have been earned.

136. At a minimum, Securities Intermediary (on behalf of its customer) is entitled to the return of all premiums that Securities Intermediary paid to Columbus Life on the Policy (on behalf of its customer), plus interest.

137. When Securities Intermediary's customer acquired the Policy for a substantial sum, it acquired all right, title and interests in the Policy, including the rights to all previously made premium payments that had been paid to Columbus Life from 2005 through 2013.

138. After acquiring the Policy on behalf of its customer, Securities Intermediary (on behalf of its customer) has paid premiums to Columbus Life in good faith through today.

139. The Court should automatically award Securities Intermediary all of the premiums that Columbus Life has ever received on the Policy, because as other courts have recognized in awarding automatic premium refunds on void policies:

> The payment ... [of] premiums is the consideration for which the insurer agrees to assume the risk specified in the policy. If an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk.

*Sun Life Assur. Co. of Can. v. Berck*, 719 F. Supp. 2d 410, 418–19 (D. Del. 2010) (quoting 5 Couch on Insurance 69:2 (3d ed. 1996)); *see also U.S. Bank Nat'l Ass'n v. Sun Life Assur. Co. of Can.*, 2016 WL 8116141, at *19 (E.D.N.Y. Aug. 30, 2016); *Sun Life. Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598, at *18, 21 (S.D. Fla. Jan. 14, 2016), *aff'd in part, reversed in part and remanded*, 693 F. App'x 838 (11th Cir. June 12, 2017).

140. Alternatively, if the Court does not award Securities Intermediary an automatic return of premiums, Securities Intermediary (on behalf of its customer) should be awarded a return of premiums on theories of unjust enrichment, money had and received, quantum meruit, and/or restitution

141. Columbus Life undertook a thorough internal investigation into so-called STOLI policies beginning in 2006, in connection with which Columbus Life, among other things, flagged the Policy as a potential STOLI policy. Yet the company repeatedly represented to Securities Intermediary that the Policy was valid and in-force and continued to demand and accept premium from Securities Intermediary on the Policy.

142. Columbus Life continued to charge and accept premiums under the Policy from 2006 through 2021 with such knowledge.

143. Even though Columbus Life was aware in 2006 that the Petersons used annuity income to fund premium on the Policy and that Altair, LLC was a general partner in the Partnership— the very information Columbus Life now contends is the predicate for its contention that the Policy is void — and even though Columbus Life flagged the Policy as a potential STOLI policy by 2006, Columbus Life issued Verifications of Coverage on the Policy, issued Annual Reports on the Policy, and issued In-Force Illustrations on the Policy from the Policy's inception through the date it commenced this litigation.

144. Unlike Columbus Life, who flagged the Policy as a potential STOLI policy by no later than 2006, when Securities Intermediary's customer acquired the Policy in 2013, Securities Intermediary's customer had no reason to believe that the Policy lacked

an insurable interest, constituted an illegal wager, or otherwise could possibly be deemed an illegal STOLI policy under Arizona law.

145.     Securities Intermediary conferred a benefit on Columbus Life in the form of premiums, and Columbus Life consciously accepted those payments.

146.     Securities Intermediary did not confer the premiums gratuitously, but, instead, expected to receive the benefits from the Policy, a fact of which Columbus Life was aware.

147.     Columbus Life has been unjustly enriched to the extent of the premiums received under the Policy, plus interest.

148.     Under such circumstances, it would be inequitable for Columbus Life to retain any of the premiums paid to it in connection with the Policy.

## JURY TRIAL DEMAND

Securities Intermediary hereby demands a trial by jury for all issues that may be triable by jury in this action.

## DEMAND FOR RELIEF

**WHEREFORE**, Securities Intermediary demands judgment in its favor as follows:

A.     Declaring that Columbus Life must pay Securities Intermediary the benefits owed under the Policy;

B.     Awarding Securities Intermediary compensatory damages in an amount to be determined at trial but not less than $2,500,000 plus interest and punitive damages;

C.     Alternatively, in the event that the Policy is declared invalid and rescinded, awarding Securities Intermediary compensatory damages in an amount to be determined at trial but not less than $2,500,000 plus interest and punitive damages;

D.     A declaration that Columbus Life must pay to Securities Intermediary all amounts paid as premiums under the Policy, plus pre- and post-judgment interest;

E.     Awarding Securities Intermediary its attorneys' fees, costs, and disbursements;

F.     Pre- and post-judgment interest as authorized by law; and

G.     Such other and further relief as the Court shall deem just and proper.

RESPECTFULLY SUBMITTED this     day of June, 2022.

**SANDERS & PARKS, P.C.**

By  */s/ Vincent R. Miner*
     Edward R. Glady, Jr.
     Vincent R. Miner

3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099

-and-

**ARENTFOX SCHIFF, LLP**

By  _/s/ Julius A. Rousseau_
Julius A. Rousseau, III (*Admitted Pro Hac Vice*)
Andrew Dykens (*Admitted Pro Hac Vice*)
   1301 Avenue of the Americas, Fl. 42
   New York, NY 10019
   *Attorneys for Defendant-Counterclaim*
   *Plaintiff Wilmington Trust, N.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this _____ day of June, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nancy R. Giles
Laura C. Martinez
**GILES LAW, PLLC**
4808 N. 22nd St., Suite 200
Phoenix, AZ 85016
ngiles@gileslegal.com
lmartinez@gileslegal.com

and

Michael J. Broadbent (Admitted Pro Hac Vice)
**COZEN O'CONNOR**
1650 Market Street, Suite 2800
Philadelphia, PA 19103
mbroadbent@cozen.com
*Attorneys for Plaintiffs*


 /s/_____